UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SHAWN THOMAS and THE TABLETOP ADVENTURE, LLC, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. 3:24-CV-3061-B |
| LEYLINE PUBLISHING, LLC; LEYLINE EDUCATION, PLLC; ANTHONY BEAN; and ALICIA FIGLIUOLO, | § § § § § | |
| Defendants. | § § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is a Motion for Summary Judgment (Doc. 52) filed by Defendants Leyline Publishing, LLC; Leyline Education, PLLC; Anthony Bean; and Alicia Figliuolo (together, "Leyline"). Plaintiffs Shawn Thomas and The Tabletop Adventure, LLC ("Tabletop") filed a response in opposition (Doc. 64), and Leyline filed a reply with objections to evidence relied upon in Plaintiffs' response (Doc. 67). Having reviewed the facts, briefing, and applicable law, the Court **GRANTS** Leyline's Motion for Summary Judgment. A final judgment will follow.

### I.
### BACKGROUND

This case is about a collaborative board game development effort that went awry. Now popularized by television programs like Netflix's *Stranger Things* and CBS's *The Big Bang Theory*, tabletop role playing games ("TTRPGs") are a class of board games where players sit around a table and personate fictional characters by narrating their actions. While TTRPGs are merely a hobby to many, the parties to this case envisioned TTRPGs as something more: a tool to help mental health

professionals treat their patients through roleplay. Together, using an existing open-source rulebook system, the parties began to develop a game called Realms of Kymoria ("RoK"), which would be optimized for therapeutic functions. But just as they were set to begin marketing, the parties caught wind of an upcoming change to the license that had theretofore allowed game developers to use the open-source system. In response to this news, Plaintiffs wanted to overhaul the game to use an independently developed system; Defendants wanted to proceed as originally planned. This lawsuit ensued.

Plaintiffs assert two principal grievances: (1) that Leyline infringed their intellectual property rights by continuing to market the RoK game after the parties' falling-out, and (2) that Leyline used Thomas's name and image in its promotion efforts without permission. *See* Doc. 1, Compl. ¶¶ 52–53. Plaintiffs' nine-count complaint can be conceptually divided into the counts advancing intellectual property claims (Counts I–III) and the counts protesting the use of Thomas's name and image to promote the RoK products (Counts IV–IX). This Court, in a previous memorandum opinion denying Plaintiffs' motion for a preliminary injunction, summarized the facts and made legal conclusions that are relevant to Leyline's current request for summary judgment on all counts. *See generally* Doc. 42, Mem. Op. & Order.

As relevant to the intellectual property claims, the Court previously held that the parties are likely bound by a licensing agreement that allows Leyline to distribute Tabletop's intellectual property. *See id.* at 11–17. After rejecting Plaintiffs' arguments to the contrary, the Court concluded that "the second licensing agreement is a valid contract, and it is still in effect."[1] *See id.* at 11–15.

---

[1] The parties agreed at the time of the preliminary injunction hearing that their first licensing agreement was inoperative. *See id.* at 11.

However, at that juncture, the Court could only hold that the second licensing agreement "likely" authorized Leyline to distribute the RoK game materials because it was unclear what materials were being distributed and whether they overlap with the intellectual property covered by the licensing agreement. *See id.* at 15–17.

The second licensing agreement, which Thomas drafted, authorizes Leyline to use and sell the content that it purchases from Tabletop. *See* Doc. 26-2, Ex. 2, at 1–2. Thomas agreed to provide several services, including "[h]igh-level writing, editing, and proofreading" of RoK rulebooks and modules; illustrations of maps and scenery associated with the modules; and collaboration on promotion and launch efforts. *Id.* Leyline was required to pay for Thomas's writing, editing, and proofreading at a per-word rate, with additional royalty payments promised based on the number of copies that Leyline was able to sell. *Id.* at 2–3. Although the RoK content produced by Thomas— "including the logo, website content, business model, and so on"—remains Thomas's intellectual property under the agreement, Leyline "own[s] the rights to produce, market, and sell the content shared with their own branding." *Id.* at 2. Thomas "cannot ask [Leyline] to stop selling/using" the content that it purchased through the agreement. *Id.* The only exceptions are if Leyline "refuse[s] to honor the royalty payout" provisions or if Leyline transfers the rights to use the content to someone else. *Id.*

The second licensing agreement also contained various payment terms for several possible scenarios. *See id.* at 4. For the final RoK game, Leyline was required to "send payment within 10 days of mutual agreement and acceptance . . . and/or within agreed upon payment schedules for collaboration/consultation/training." *Id.* In contrast, for content intended for an early promotional "Kickstarter" campaign, "an alternative payment plan can be leveraged." *Id.* Upon receipt of funds

from a successful pre-sale campaign, Leyline would owe ten percent of Plaintiffs' total fee each month for ten months, and royalties would be paid separately after the sales campaign. *Id.* If the Kickstarter campaign failed or "anything else," "the current completed content will be handed over as-is and will need to be paid over the course of 4 months (25% per month)." *Id.*

Denying Thomas's bid for a preliminary injunction, the Court noted that Thomas had not established that Leyline distributed or planned to distribute unpurchased content created by Thomas. *See* Doc. 42, Mem. Op. & Order, 15–17 & n.6. Whether Leyline infringed Thomas's intellectual property rights depended on determining (1) what content Leyline purchased or was otherwise authorized to use through the agreement and (2) whether it matched the content it was distributing.

As to what Leyline purchased or was authorized to use, Thomas admitted at his deposition that "[a]ll of the invoices that I had submitted . . . were paid" in full by Leyline. Doc. 55-5, Thomas Dep., 62:17–18. Thomas also said that he performed work for which he did not bill Leyline "because the project was still in development." *Id.* at 62:23–63:7. Certain services—including the "high-level writing, editing, [and] proofreading"—would be "accounted for upon project completion." *Id.* at 63:22–24. To that effect, in response to Leyline's summary judgment motion, Thomas submitted an affidavit with a list of services he performed under the second licensing agreement but for which he has not requested payment. *See* Doc. 66-1, Thomas Aff. 3–6.[2] In the affidavit, Thomas says that he kept these "careful records so that I could properly bill Leyline Publishing when the work was completed," and that Leyline "knew that I was doing this work, that I was tracking my time, and that

---

[2] Leyline objects to consideration of Thomas's affidavit and the attached summary of services as conclusory, irrelevant, and inadmissible. *See* Doc. 67, Reply, 2–7. Because those materials do not alter the outcome, the Court declines to decide whether they constitute proper summary judgment evidence.

I would have the expectation of payment once it was completed." *Id.* at 1–2. Plaintiffs do not claim that Leyline refused to pay any duly performed services under the agreement.

As to what Leyline has distributed, Plaintiffs have pointed only to early promotional campaigns prior to the RoK game's full launch. *See* Doc. 1, Compl. ¶¶ 42–45; Doc. 1-3, Compl. Ex. 3; Doc. 1-4, Compl. Ex. 4; Doc. 1-8, Compl. Ex. 8. In response to Leyline's assertion that it is licensed to use the content in those early sales campaigns, Plaintiffs have not specified what copyrighted content Leyline is using or plans to use without license.

The name-and-image counts are not squarely addressed by the Court's previous ruling. The allegedly permissionless uses of Thomas's name and image are (1) an automated email sent to RoK's early supporters, which is drafted as if co-written by Thomas as "creator" and "[f]ounder" of the game, *see* Doc. 1-4, Compl. Ex. 4; and (2) a webpage featuring Thomas's headshot image and identifying him as a "Co-Creator," *see* Doc. 1-9, Compl. Ex. 9, at 1. The crux of all six name-and-image counts is Thomas's assertion that the use of his name after he withdrew from the RoK project falsely portrayed him as endorsing activities that he considers infringing and allowed Leyline to unfairly benefit from his perceived endorsement. *See* Doc. 65, Br. Resp., 5–7.

Arguing that Plaintiffs cannot succeed on the name-and-image counts, Leyline raises facts relevant to whether representing Thomas as a creator of the RoK game was authorized and truthful. For the automated email, Leyline has presented Defendant Figliuolo's deposition testimony that Thomas co-wrote and authorized the email. *See* Doc. 54, Br. Mot., 35–36. Leyline also points out that, in a December 2022 interview with a TTRPG journalist, Thomas described himself as "the Creative Director at Geek Therapeutics"[3] and "part of 'the two-person development team' that

---

[3] "Geek Therapeutics" is Leyline's trade name.

brought [the] RoK Project together." *Id.* at 11–12. That self-description matches Thomas's "role of Creative Director" under the second licensing agreement. Doc. 26-2, Ex. 2, at 1. The second licensing agreement also stipulates that for "[i]llustrations of battlemaps and scenic maps to be used in modules, training, core books, marketing, etc.," Leyline should give "[c]redit to [Thomas] as the artist when and where credit can be appropriately provided." *Id.* at 3. Both allegedly permissionless uses of Thomas's name appear to feature at least one map illustration. *See* Doc. 1-4, Compl. Ex. 4; Doc. 1-9, Compl. Ex. 9, at 1.

## II.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute "is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party." *Burrell v. Dr. Pepper/Seven Up Bottling Grp.*, 482 F.3d 408, 411 (5th Cir. 2007) (citation omitted). To determine whether a genuine dispute exists, the Court views the evidence in the light most favorable to the nonmovant. *Munoz v. Orr*, 200 F.3d 291, 302 (5th Cir. 2000). When the nonmovant would bear the burden of proof on an issue at trial, the movant can secure summary judgment "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Once the movant has established the absence of genuine dispute as to a material fact, the burden shifts to the nonmovant, who must show that summary judgment is not appropriate. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Celotex*, 477 U.S. at 325). "This burden

is not satisfied with 'some metaphysical doubt as to the material facts,' . . . by 'conclusory allegations,' . . . by 'unsubstantiated assertions,' . . . or by only a 'scintilla' of evidence." *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (other citations omitted). A nonmovant with the burden of proof must "identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004) (citation omitted). Finally, the evidence that any party proffers "must be competent and admissible at trial." *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012).

## III.

## ANALYSIS

The Court divides its analysis between Plaintiffs' intellectual property claims and their name-and-image claims. Leyline has established the absence of a genuine dispute on material facts necessary to enter judgment in its favor on all claims, and Plaintiffs have not adequately responded with evidence to support their claims. Accordingly, the Court grants Leyline's motion for summary judgment.

A. *Leyline's Use of the RoK Intellectual Property Is Authorized by the Second Licensing Agreement.*

The three intellectual property counts in Plaintiffs' complaint are direct copyright infringement of content owned by Tabletop (Count I), secondary copyright infringement through inducing the creation of derivative works to market Tabletop's content (Count II), and infringement of Plaintiffs' RoK trademark (Count III). *See* Doc. 1, Compl. ¶¶ 54–84. As the Court previously explained, "[p]ossessing a valid license is a defense to claims for copyright infringement . . . [and] trademark infringement . . . ." Doc. 42, Mem. Op. & Order, 11 (first citing *Baisden v. I'm Ready*

*Prods., Inc.*, 693 F.3d 491, 499 (5th Cir. 2012); and then citing *Exxon Corp. v. Oxford Clothes, Inc.*, 109 F.3d 1070, 1075 (5th Cir. 1997)). Leyline seeks summary judgment that the operative licensing agreement bars the intellectual property claims because it authorizes the marketing efforts at issue. *See* Doc. 54, Br. Mot., 17–33. To avoid summary judgment, Plaintiffs argue that (1) the license never was or no longer is valid and (2) even if the license is valid, it does not cover some portion of content that Leyline has used. *See* Doc. 65, Br. Resp., 2–5. The Court addresses each set of arguments in turn.

    1. <u>The second licensing agreement is a valid contract.</u>

The Court rejects Plaintiffs' rehashed arguments that the licensing agreement is not in effect. Plaintiffs argue, as they did before, that "the 'Second Licensing Agreement' was not signed by both parties," Doc. 65, Br. Resp., 2; that the agreement was an "agreement to agree" on licensing later, *see id.* at 2–3; and that Plaintiffs terminated or revoked the license by sending a cease-and-desist letter, *see id.* at 5. On these issues, the Court previously held that the second licensing agreement did not require signatures to take effect, *see* Doc. 42, Mem Op. & Order, 13; that the agreement was not an option contract, *see id.* at 12–13; and that Plaintiffs therefore could not unilaterally revoke the license by sending a cease-and-desist letter, *see id.* at 13. As Plaintiffs present no new evidence in support of these arguments, the Court sees no reason to depart from its previous holdings.

Plaintiffs also argue that Leyline materially breached by failing to pay Thomas for unbilled work, which allowed them to terminate the agreement.[4] *See* Doc. 65, Br. Resp., 3. Earlier, Plaintiffs had not offered evidence that Leyline had breached. *See* Doc. 42, Mem. Op. & Order, 15. Now,

---

[4] Plaintiffs state in their brief that the "parties agreed to terminate the agreement," Doc. 65, Br. Resp., 3, but do not provide any evidence that the contract was mutually terminated. The Court therefore construes the statement as asserting that Plaintiffs could unilaterally terminate after the alleged material breach.

Plaintiffs point to the purported existence of "over 3,000 hours of billable work" that was "unbilled and unpaid by" Leyline. Doc. 65, Br. Resp., 3; *see* Doc. 66-1, Thomas Aff., 1–6 (documenting purportedly unbilled and unpaid work).

As the Court explained in its previous opinion, when one party materially breaches a contract, the non-breaching party may terminate the contract. *See* Doc. 42, Mem. Op. & Order, 14–15 (citing *C&C Rd. Constr., Inc. v. SAAB Site Contractors, L.P.*, 574 S.W.3d 576, 585 (Tex. App.–El Paso 2019, no pet.)). "The failure to make a complete payment when due under a contract may constitute a material breach." *Id.* (quoting *N.Y. Party Shuttle, LLC v. Bilello*, 414 S.W.3d 206, 215 (Tex. App.–Houston 2013, pet. denied)). But "[t]he failure to pay a claim that was never made cannot constitute a breach of contract." *Bunting v. State Farm Lloyds*, No. 3-98-CV-2490-BD, 2000 WL 191672 (N.D. Tex. Feb. 14, 2000) (Kaplan, Mag. J.).

The uncontested fact that Plaintiffs never billed Leyline for the purportedly unpaid work performed under the agreement is fatal to their argument that Leyline materially breached. Plaintiffs have not asserted that Leyline ever refused to pay and, to the contrary, admit that Leyline knew that Thomas "would have the expectation of payment" once the work was complete and the invoices submitted. *See* Doc. 66-1, Thomas Aff., 2. As the Court previously noted, the promise to pay constituted the consideration under the agreement. *See* Doc. 42, Mem. Op. & Order, 14. Leyline never broke the promise to pay. Accepting Plaintiffs' argument of material breach would enable contracting parties to induce a "breach" by not providing information necessary for payment. The Court declines to incentivize such conduct.

Having once again considered and rejected Plaintiffs' arguments that the second licensing agreement is invalid, the Court concludes based on the undisputed facts that the second licensing

agreement is in effect as a valid contract that binds the parties.

2. The license covers the RoK content distributed by Leyline.

Leyline has established that the second licensing agreement authorizes the distribution of the content at issue in this case. Under the second licensing agreement, Thomas agreed to produce RoK content for Leyline to sell. *See* Doc. 26-2, Ex. 2, at 1–2. Leyline acquired the sole right to "produce, market, and sell the content" conditioned upon payment for Thomas's services and non-alienation of its contractual rights. *See id.* at 2. Leyline has paid the complete amount of every invoice that Thomas submitted for his services. *See* Doc. 55-5, Thomas Dep., 62:17–18. Thus, the parties agree that, at the very least, RoK content produced by Thomas through work reflected in the paid invoices is within the scope of the license.

In addition to content for which Leyline has fully paid, the license also includes content that Thomas produced through the contractually agreed-upon services even before payment is complete. Plaintiffs, asserting that "there is over $140k of unpurchased work that has been incorporated into the product the Defendants are selling," fixate on the second licensing agreement's conferment of a license only as to "what is purchased by Leyline." Doc. 65, Br. Resp., 4. The fact that Leyline has not yet paid those amounts, according to Plaintiffs, means that the license does not cover the content created through that work. *See id.* But this argument ignores that payment under the agreement is explicitly contemplated to occur in all circumstances *after* Leyline produces, markets, sells, and/or otherwise uses the content to generate revenue. *See* Doc. 26-2, Ex. 2, at 4. Reading the phrase "what is purchased by Leyline" to require advance payment does not square with the terms of the contract as a whole. *See Woolley v. Clifford Chance Rogers & Wells, L.P.*, 51 F. App'x 930, 930 (5th Cir. 2002) (per curiam) ("One of the fundamental tenets of contract interpretation is that contracts should be

read as a whole, viewing particular language in the context in which it appears." (citation omitted)). The Court therefore rejects Plaintiffs' proposed reading of the license's scope.

Thomas's affidavit provides a purported record of the work for which he has not billed but that he "performed under the second agreement." *See* Doc. 66-1, Thomas Aff. 1–2. That the services were performed under the second agreement is all that is necessary to activate Leyline's license to produce, market, and sell the resulting content. Leyline's unbroken promise to ultimately pay—not the final completion of payment—triggers its license to use and sell the content under the agreement.

The license also covers use of the RoK trademark in marketing and selling the RoK game. To argue otherwise, Plaintiffs point to the agreement's statement that Leyline may sell the content "shared with their own branding." *See* Doc. 65, Br. Resp., 4 (citation omitted); Doc. 26-2, Ex. 2, at 2. In context, that reference appears to permit Leyline to sell the content under its "Geek Therapeutics" brand name, not to require that Leyline abstain from marketing and selling the game as "Realms of Kymoria." Adopting Plaintiffs' preferred interpretation would frustrate the terms of the agreement allowing Leyline to produce, market, and sell the content created by Thomas—all of which is "associated with the setting 'Realms of Kymoria.'" *See* Doc. 26-2, Ex. 2, at 1.

Count II—the allegation that Leyline induced the creation of derivative works based on Thomas's content—does not receive any separate discussion in the parties' briefing. It is unclear to the Court what content distributed by Leyline is purportedly derivative of Thomas's copyrighted content, and Plaintiffs do not identify any such content. In any event, however, the licensing agreement confers a broad right to market, sell, and use RoK content provided by Thomas and does not prohibit developing marketing material that is derivative of Thomas's original work in marketing efforts.

Leyline has established, as a matter of undisputed fact, that it is authorized to use the RoK content provided by Thomas under the second licensing agreement. That agreement references a broad variety of RoK content that Thomas would produce and provide to Leyline. Doc. 26-2, Ex. 2, at 1. The allegedly infringing content consists only of RoK promotional content, *see* Doc. 1, Compl. ¶¶ 42–45; Doc. 1-3, Compl. Ex. 3; Doc. 1-4, Compl. Ex. 4; Doc. 1-8, Compl. Ex. 8, the production of which would be covered by the agreement. *See* Doc. 26-2, Ex. 2, at 1. No reasonable jury presented with these facts could conclude that Leyline is not entitled to a defense of licensed use on the intellectual property claims.

As the burden thus shifts to Plaintiffs to present evidence supporting their claims, they argue that "some of the rights Defendants argue they possess were only to be granted as part of the first, non-operative, agreement." Doc. 65, Br. Resp., 4. Without any substantiation of what precise content was provided solely under the first licensing agreement and not covered by the license in the second agreement, Plaintiffs' argument amounts to no more than an unsatisfactory assertion of "metaphysical doubt." *See Little*, 37 F.3d at 1075 (explaining that "metaphysical doubt," "conclusory allegations," "unsubstantiated assertions," or a mere "scintilla of evidence" are not sufficient to withstand summary judgment) (citations omitted). The Court therefore grants summary judgment to Leyline on the three intellectual property claims.

B.  *Plaintiffs Have Not Established Essential Elements of Their Name-and-Image Claims.*

The six name-and-image counts are libel and slander based on the email drafted as if co-written by Thomas (Count IV), invasion of privacy and violation of publicity rights through appropriation of Thomas's name or likeness in the email and by featuring him on the webpage (Counts V and VI), false endorsement and unfair competition under the Lanham Act by falsely

affiliating Thomas with Leyline's business and capitalizing on his reputation and goodwill associated with RoK (Counts VII and VIII), and unjust enrichment for all of this improper conduct done without compensating Plaintiffs (Count IX).[5] *See* Doc. 1, Compl. ¶¶ 85–119.

Essential elements of these causes of action include that the statements are false and/or made without permission.[6] Count IV—the libel-and-slander (or defamation) claim—requires that Leyline's public statements about Thomas were false. *See* Tex. Civ. Prac. & Rem. Code § 73.005(a) ("The truth of the statement in the publication on which an action for libel is based is a defense to the action."); Dan B. Dobbs, Paul T. Hayden & Ellen M. Bublick, *The Law of Torts* § 519 (2d ed. 2025) (providing elements of defamation). All of the claims require that the use of Thomas's name and image was permissionless. *See* Restatement (Second) of Torts § 584 (1977) ("[T]he consent of another to the publication of defamatory matter concerning him is a complete defense to his action for defamation."); Dobbs, Hayden & Bublick, *supra*, § 579 ("[T]he gist of the tort [of appropriating the plaintiff's personality] is the *unconsented to* appropriation of the plaintiff's identity or reputation . . . ." (footnote omitted and emphasis added)); 4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 28:15 (5th ed. 2025) ("False endorsement cases under [the] Lanham Act . . . include[] *unpermitted* use of [the] plaintiff's identity . . . ." (emphasis added)). Unjust enrichment (asserted in Count IX) is barred by the existence of "a valid contract which governs the 'services or materials furnished.'" *Molzan v. Bellagreen Holdings, L.L.C.*, 112 F.4th 323, 336 (5th Cir. 2024) (citation omitted).

---

[5] Some of the name-and-image counts (Counts VII, VIII, and IX) also assert that Leyline improperly used Plaintiffs' copyrighted property. Those assertions fail due to Leyline's licensed use, as explained in the previous section.

[6] For the claims based on state law, the principles in this paragraph are fundamental to the causes of action and ubiquitous across jurisdictions. Because there is no apparent conflict of law, the Court need not engage in a choice-of-law analysis. *See Mumblow v. Monroe Broad., Inc.*, 401 F.3d 616, 621 (5th Cir. 2005).

The name-and-image counts fail because portraying Thomas as creator of RoK was true, authorized, and governed by a valid contract. First, Thomas described himself in interviews and in this litigation as one of the creators of the RoK game. *See* Doc. 54, Br. Mot., 11–12; Doc. 1, Compl. ¶¶ 14–16, 33. Thus, Leyline's statements regarding Thomas's role in developing the game cannot amount to defamation. Second, whether or not Thomas specifically authorized the email and webpage, the second licensing agreement named him "Creative Director" and required, where appropriate, that Thomas be given credit for his services. *See* Doc. 26-2, Ex. 2, at 1, 3. The email and webpage reflect an intent to give credit to Thomas in his role as Creative Director as contemplated in the agreement. As to the email specifically, Plaintiffs have not raised an alternative theory or facts to dispute Leyline's explanation supported by deposition testimony that the email was co-written by Thomas and designed to be sent to supporters automatically. *See* Doc. 54, Br. Mot., 35–36. Simply calling that fact "disputed," *see* Doc. 65, Br. Resp., 6, does not raise a genuine dispute. And finally, the second licensing agreement outlined how Thomas would be compensated for his services to promote the product on behalf of Leyline. *See* Doc. 26-2, Ex. 2, at 1–2. Because a valid contract governs the ways in which Thomas's portrayal as the "public face" of RoK (*see* Doc. 65, Br. Resp., 6) will be compensated, the claim for unjust enrichment cannot proceed.

Plaintiffs attempt to avoid the failure of these claims by once again arguing that their cease-and-desist letter revoked permission to use Thomas's name and image. *See id.* But Plaintiffs' letter could not have unilaterally revoked the valid, binding agreement granting those permissions.

Leyline has established as a matter of undisputed material fact that Plaintiffs cannot prove that publicly describing Thomas as creator of RoK was false or unauthorized, and Plaintiffs in response have not pointed to evidence that would support their claims. The Court therefore grants

summary judgment to Leyline on the name-and-image claims.

## IV.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Leyline's Motion for Summary Judgment (Doc. 52). A final judgment will follow.

**SO ORDERED**.

**SIGNED: January 21, 2026.**

_____
JANE J. BOYLE
SENIOR UNITED STATES DISTRICT JUDGE